[Cite as *State v. Herron*, 2019-Ohio-3292.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 28146 |
| | : | |
| v. | : | Trial Court Case No. 2017-CR-2437 |
| | : | |
| KEASON HERRON | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 16th day of August, 2019.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by MICHAEL P. ALLEN, Atty. Reg. No. 0095826, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
      Attorney for Plaintiff-Appellee

THOMAS J. MANNING, Atty. Reg. No. 0059759, P.O. Box 751484, Dayton, Ohio 45475
      Attorney for Defendant-Appellant

. . . . . . . . . . . . .

DONOVAN, J.

{¶ 1} Defendant-appellant Keason Herron appeals his conviction for one count of murder (proximate result), in violation of R.C. 2903.02(B), an unclassified felony; one count of felonious assault (serious harm), in violation of R.C. 2903.11(A)(1), a felony of the second degree; two counts of tampering with evidence (alter/destroy), in violation of R.C. 2921.12(A)(1), both felonies of the third degree; and one count of having weapons while under disability (prior drug conviction), in violation of R.C. 2923.13(A)(3), a felony of the third degree. Herron filed a timely notice of appeal with this court on October 1, 2018.

{¶ 2} The record establishes that on the evening of August 4, 2017, the victim, Leanette Newton, was socializing at a residence located in Dayton, Ohio, on Dearborn Avenue (hereinafter "the Dearborn residence"). The residence in question belonged to the mother of defendant-appellant, Herron. The Dearborn residence had a detached garage that was used by people in the neighborhood as a place to congregate and drink alcohol. Between approximately 4:00 p.m. and 6:00 p.m. that evening, Herron arrived at the Dearborn residence, briefly spoke to Newton, and left shortly thereafter. At some point that evening, Newton also left the Dearborn residence.

{¶ 3} Here, we note that Newton and Herron had been involved in an "on-off" relationship since approximately 2006 or 2007. Herron testified that his relationship with Newton was marked by periods of instability, volatility, and violence from both parties. Herron further testified that his and Newton's alcohol use greatly exacerbated their relationship difficulties. Herron testified that, by August 4, 2017, he and Newton were no longer in a relationship, and Newton had moved all of her personal property out of the residence she previously shared with Herron on Blanche Street in Dayton, Ohio.

{¶ 4} Later on the night of August 4, 2017, Herron returned to the Dearborn residence and began drinking with others who were present. Eventually, Newton arrived back at the Dearborn residence and also began drinking. Herron testified that, in order to avoid a confrontation with Newton, he immediately left the Dearborn residence and drove to his current girlfriend's apartment, but he was unable to gain entrance. Thereafter, Herron drove to his residence on Blanche Street.

{¶ 5} After Herron left, Newton remained at the Dearborn residence and continued to drink alcohol for a short time. Kimberly Moss, another individual who was drinking alcohol at the Dearborn residence, testified that at approximately 11:30 p.m., Newton asked Moss for a ride to her mother's house nearby. At Newton's request, Moss drove her vehicle past Herron's residence on Blanche Street. Newton then asked Moss to drop her off at a park located behind Herron's residence.

{¶ 6} Shortly thereafter, Newton walked over to Herron's residence and began yelling at Herron while they stood in his front yard. Herron testified that he then went inside his house, leaving Newton outside. Herron testified that once he was inside, he observed that it looked as if someone had broken into and ransacked his house. Herron testified that he thought Newton had broken into his house. (We note that the police investigation found that there was no damage to any of the doors or windows in the residence. The police also found that all of the windows were locked the next morning on August 5, 2017.) Herron testified that in order to scare Newton, he picked up a handgun from inside his house, walked outside, and fired four shots into the ground. Herron testified that after he fired the warning shots, Newton yelled at him and walked away. (We note here that the police were unable to find any shell casings in the area

where Herron stated that he fired the handgun. Additionally, no handgun was ever recovered by the police during their investigation.)

{¶ 7} Herron testified that, at this point, he got into his truck and drove over to Newton's mother's residence where Newton was then living. Upon arriving, Herron asked Newton's mother to come to his residence and retrieve her daughter. In the alternative, Herron asked Newton's mother to send Newton's brother over to help. Newton's mother refused to help, so Herron left and drove back to his residence.

{¶ 8} Herron testified that after entering his residence, he heard a noise behind him and turned around to see Newton walking toward him with a "stick." Herron testified that he ran into his bedroom and retrieved a shotgun from his closet. Herron testified that he ejected the shells out of the shotgun and began to "jab" Newton with the barrel. Admittedly "furious" and "seeing red," Herron struck Newton several times, eventually causing her to fall down on the floor. Herron testified that at this point, he grabbed Newton around her neck and began choking her in an effort to wrest the stick from her hand. Herron testified that after successfully doing so, he hit Newton with the stick and then threw it outside in the yard.

{¶ 9} Herron testified that Newton remained seated on the floor and began falling asleep. After Newton began to snore, he went into his bedroom and fell asleep for a few hours. When Herron woke up, he observed that Newton had not moved from the position that he last saw her in hours earlier. Herron testified that he then attempted to rouse Newton, but she did not respond.

{¶ 10} Later that morning, Herron's uncle, Dennis Richardson, drove his truck to Herron's residence for assistance in repairing his lawnmower. Richardson testified that

upon arriving at Herron's residence, he observed that the front door was standing open. When Richardson approached the residence, Herron came outside and told Richardson to enter the house. Once the men were inside the house, Herron gestured toward Newton's body and stated to Richardson, "she died on me." Richardson testified that he initially thought that Herron and Newton were playing a joke on him, and he tried to leave the residence. Herron, however, blocked the door and handed Richardson the shotgun, which had been wrapped in a sheet. Herron told Richardson that he was not supposed to have the shotgun. Richardson went outside and placed the shotgun in the bed of his truck.

{¶ 11} Richardson testified that he then reentered the residence and told Herron to give him a "video camera" in order to prevent Herron from posting anything on social media, as Richardson still believed the whole situation to be a bad prank. Herron then handed Richardson a DVR recording box and a disc containing surveillance video from cameras installed on and around Herron's residence. Richardson went back outside, placed the surveillance items in the bed of his truck, and drove home. Richardson testified that once he reached his residence, he removed Herron's shotgun and surveillance gear from his truck and put the items in his garage. Richardson testified that he believed that Herron would call when and if he needed the items.

{¶ 12} After Richardson left, Herron walked down the street to a nearby convenience store where he encountered William Wagner, his stepfather's brother. Wagner testified that he was at the store to purchase some items for another relative while he was on a break from his job at the VA Hospital. Herron approached Wagner and asked to use his cellphone. Wagner handed Herron his cellphone. Herron testified

that he then used Wagner's cellphone to call 911 as he walked back toward his residence. Herron was immediately arrested and taken into custody when the police and other emergency personnel arrived at his residence.

{¶ 13} Shortly thereafter, Dayton Police Officer Craig Stiver was dispatched to Herron's residence to take photographs of the crime scene. Officer Stiver took photographs of a long metal bar that had been placed on top of an animal cage, a crowbar retrieved from the kitchen, bloodstains in the hallway and on the door to Herron's bedroom, and bloodstains on Herron's bedroom dresser, stereo cabinet, pillow, and bedsheets. Stiver also photographed bloodstains on and around the toilet in the bathroom.

{¶ 14} On August 10, 2017, Herron was indicted for one count of murder, one count of reckless homicide, and one count of felonious assault. At his arraignment on August 15, 2017, Herron appeared and pled not guilty to the charged offenses.

{¶ 15} On August 30, 2017, Herron filed a motion to suppress any statements he made to the police after being arrested and taken into custody. The trial court held a hearing on the motion to suppress on December 15, 2017. On January 12, 2018, the trial court overruled in part and sustained in part Herron's motion to suppress.

{¶ 16} On April 10, 2018, the State filed two motions in limine. In the first liminal motion, the State sought to limit or exclude testimony and other evidence related to the defense's invocation of the Castle Doctrine. In its second liminal motion, the State sought to exclude any evidence regarding specific past instances of domestic violence allegedly instigated by Newton against Herron. The trial court overruled the State's motion related to the Castle Doctrine; however, the trial court granted the State's motion

related to Newton's past conduct.

{¶ 17} On July 5, 2018, Herron was charged in a "B" indictment with two counts of tampering with evidence, and one count of having weapons while under disability. The "B" indictment was based upon the State's discovery of the shotgun and DVR equipment that Herron had given to Richardson to hide. On August 9, 2018, Herron filed a jury waiver with respect to the charge of having weapons while under disability.

{¶ 18} A three-day jury trial was held on the remaining counts on August 20-22, 2018. At trial, Montgomery County Coroner's Office forensic pathologist Dr. Susan Allen testified that she had performed an autopsy on Newton on August 5 and 6, 2017. Dr. Allen testified that Newton's cause of death was a combination of blunt force trauma and strangulation. Dr. Allen testified that she found several bruises on Newton's face and head, as well as several circular or semi-circular bruises across Newton's entire body, including her arms, abdomen, and back. Dr. Allen also testified that Newton suffered deep cuts to her jaw, left ear lobe, lips, and the back of her head. Significantly, Dr. Allen testified that Newton had a broken left leg, a broken left arm, and five broken ribs. Lastly, Dr. Allen testified that Newton presented with petechiae on her eyes, which are broken blood vessels indicating that she had been strangled. Dr. Allen testified that, based on the extent of Newton's injuries, she would have lost a great deal of blood and suffered swelling of her brain.

{¶ 19} Following his jury trial, Herron was found guilty of murder, felonious assault, and both counts of tampering with evidence. The trial court separately found Herron guilty of having weapons while under disability. The State dismissed the charge of reckless homicide. The trial court merged Herron's convictions for murder and felonious

assault, with the State electing to proceed to sentencing for the murder charge. On September 11, 2018, the trial court sentenced Herron to 15 years to life in prison for murder, three years in prison for each count of tampering with evidence, and three years in prison for having weapons while under disability. The trial court ordered the two counts of tampering with evidence to be served concurrently to one another, but consecutively to the remaining counts. The trial court also ordered that Herron's conviction for having weapons while under disability be served consecutively to the other counts, for an aggregate sentence of 21 years to life in prison.

{¶ 20} It is from this judgment that Herron now appeals.

{¶ 21} Herron's first assignment of error is as follows:

THE TRIAL COURT ERRED BY BARRING EVIDENCE AND/OR TESTIMONY AT TRIAL CONCERNING THE VICTIM'S HISTORY OF VIOLENT AND THREATENING CONDUCT, WHICH SHOULD HAVE BEEN ADMISSIBLE IN REGARD TO APPELLANT'S SELF-DEFENSE CLAIM.

{¶ 22} In his first assignment, Herron contends that the trial court erred when it excluded any testimony or other evidence regarding specific instances of Newton's history of domestic violence with Herron that he argues would have been relevant to his self-defense claim. We note that, at the close of evidence, defense counsel made a proffer to the trial court of four separate police incident reports wherein Herron was identified as the victim of assaults allegedly perpetrated by Newton.

{¶ 23} " 'The admission or exclusion of relevant evidence rests within the sound discretion of the trial court.' * * * A trial court abuses its discretion when it make a decision

that is unreasonable, arbitrary, or unconscionable. *State v. Renner*, 2d Dist. Montgomery No. 25514, 2013-Ohio-5463, ¶ 24." *State v. Williams*, 2d Dist. Montgomery No. 26369, 2016-Ohio-322, ¶ 17.

{¶ 24} During trial, Herron asserted that he acted in self-defense in order to avoid convictions for the charged offenses.   To establish self-defense, the defendant must show the following: (1) that he was not at fault in causing the altercation; (2) that he "had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was" the use of force; and (3) that he did not violate the duty to retreat or avoid danger. *State v. Barnes*, 94 Ohio St.3d 21, 24, 759 N.E.2d 1240 (2002), citing *State v. Robbins*, 58 Ohio St.2d 74, 388 N.E.2d 755 (1979), paragraph two of the syllabus.

{¶ 25} Evid.R. 401 through 403 define relevance and identify it as the threshold standard for admissibility.   Evid.R. 404(A) provides that, though it may be relevant, "[e]vidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion."   "The term 'character' refers to a generalized description of a person's disposition or a general trait such as honesty, temperance, or peacefulness.   Generally speaking, character refers to an aspect of an individual's personality which is usually described in evidentiary law as a 'propensity.' " Weissenberger's Ohio Evidence Treatise, Section 404.3 (2009 Ed.).

{¶ 26} Pertinent to the instant case, Evid.R. 405 then sets forth two methods by which character may be proved -- opinion and reputation, and specific acts evidence -- and when each type is admissible. That rule provides as follows:

(A) Reputation or Opinion. In all cases in which evidence of character or a

trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. On cross-examination, inquiry is allowable into relevant specific instances of conduct. (B) Specific Instances of Conduct. In cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense, proof may also be made of specific instances of his conduct.

{¶ 27} The State argues that the Ohio Supreme Court's holding in *Barnes* indicates that a defendant cannot offer proof of specific instances of the victim's character to prove the defendant's state of mind at the time of the offense. In *Barnes*, the issue was framed as "whether a defendant who asserts self-defense may introduce evidence of specific instances of conduct by the victim to show that the victim was the initial aggressor * * *." *Barnes,* 94 Ohio St.3d at 21, 759 N.E.2d 1240. On this issue, *Barnes* held that "[a] defendant asserting self-defense cannot introduce evidence of specific instances of a victim's conduct to prove that the victim was the initial aggressor." *Id.* at syllabus. *Barnes* further stated:

It is undisputed that a defendant can introduce character evidence by reputation or opinion testimony under Evid.R. 405(A). *See, e.g., State v. Baker*, 88 Ohio App.3d 204, 210-211, 623 N.E.2d 672, 676 (1993). But Evid.R. 405(B) is more narrowly drawn. Thus, *the relevant inquiry in this case is whether a victim's character or character trait is an essential element of self-defense. If the proof or failure of proof of the victim's character would not be dispositive of an element of self-defense, then it is not an essential component of the defense and falls outside the limited scope of*

*Evid.R. 405(B).*

      \* \* \* Although a victim's violent propensity may be pertinent to proving that he acted in a way such that a defendant's responsive conduct satisfied the elements of self-defense, no element requires proof of the victim's character or character traits.  A defendant may successfully assert self-defense without resort to proving any aspect of a victim's character.  *Therefore, Evid.R. 405(B) precludes a defendant from introducing specific instances of the victim's conduct to prove that the victim was the initial aggressor.* \* \* \*

(Emphasis added.) *Id.* at 24.

{¶ 28} In the instant case, Herron argues that the trial court's decision precluding him from introducing specific instances of Newton's past domestic violence against him prevented him from adducing evidence regarding an essential element of his self-defense claim, i.e. to explain his state of mind and the basis for his personal fear of Newton.   This court and other courts have held that the reason a defendant can testify as to specific instances of a victim's violent nature is to establish not the victim's character per se, but his own state of mind. *State v. Salyers,* 2d Dist. Montgomery No. 20695, 2005-Ohio-2772, ¶ 32; *State v. Gott*, 6th Dist. Lucas No. L-11-1070, 2013-Ohio-4624 (an alleged victim's purported violent nature is not an essential element of self-defense and therefore, witnesses other than the defendant have no admissible basis for testifying to specific instances of violent conduct); *State v. Galloway*, 2016-Ohio-7767, 74 N.E.3d 754 (5th Dist.).   Accordingly, we find that the trial court erred when it precluded Herron from testifying and introducing into evidence specific instances of Newton's past violent

conduct toward him in order to establish his state of mind at the time of the incident.

**{¶ 29}** We must next decide whether the exclusion of the otherwise admissible evidence constituted material prejudice to Herron. In *State v. Harding*, 2d Dist. Montgomery App. No. 20801, 2006-Ohio-481, ¶ 24, this court stated: "Both Evid.R. 103(A) and Crim.R. 52(A) provide that error is harmless unless the substantial rights of a defendant have been affected." The test for harmless error is whether " 'beyond a reasonable doubt' * * * the remaining evidence alone comprises 'overwhelming' proof of defendant's guilt." *State v. Williams*, 6 Ohio St.3d 281, 290, 452 N.E.2d 1323 (1983), quoting *Harrington v. California*, 395 U.S. 250, 254, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969). However, a non-constitutional error may rise to the level of constitutional error if such error amounts to "a violation of the appellant's right to a fair trial as that term is understood under the due process clause of the Fourteenth Amendment." *State v. Bankston,* 2d Dist. Montgomery No. 24192, 2011-Ohio-6486, ¶ 19. We note that some courts have questioned the application of a more relaxed standard for evaluation of prejudice when non-constitutional errors are involved. *See, e.g., State v. Morris*, 9th Dist. Medina No. 09CA0022-M, 2010-Ohio-4282.

**{¶ 30}** While the trial court precluded Herron from testifying to specific instances of Newton's past violent conduct directed at him, Herron was still allowed to testify that Newton had assaulted him in the past and that he had gone to the hospital multiple times as a result of those assaults. Specifically, Herron gave the following testimony:

Defense Counsel: And to you, what does an argument and fighting mean between the two of you?

Herron: Yelling, cussing, violence, hitting each other, just violence.

Q: *Have you been, and I guess you can't go into specific acts, but have there been multiple times when you've been struck by her?*

A: *I've been assaulted a few times.*

Q: *Enough to send you to the hospital?*

The State: Objection.

The Court: Sustained.

Defense Counsel: *When you say multiple times, do you mean – well how many times, if you could estimate?*

Herron: *More than four.*

Q: *More than four what?*

A: *That led me to the hospital.*

* * *

Q: Was it a common occurrence, when drinking was involved, that the situation would turn violent between the two of you?

A: Yes.  And as I stated before, just recently it had started getting worser and  worser [sic].   It started coming more often.   When we first got together, halfway through it was, you know, every blue moon it would happen.   Then it recently started getting worser and worser [sic].

(Emphasis added.) Tr. 604-605.

**{¶ 31}** Furthermore, Herron testified extensively at trial regarding his encounter with Newton on the night of August 4, 2017.   Herron also testified at length regarding his perception of Newton's mental state and his own feelings of fear on the night in question, as follows:

Herron: \* \* \*  It was just a bunch of stuff as she was approaching me.  And I threw the phone as she approached me to swing with this stick.  And I know that if I don't defend myself, I'm going to get hit.  *I've been there before*; *I've done it*.  I know.  I can't stand there.  She's going to strike me.  So I threw the phone at her and I made it across the bed. \* \* \*

And in the house, in the closet, there is a shotgun.  Well I grabbed the shotgun, and I'm trying to scare her.  I eject a shell out of the shotgun; I don't want to shoot her, I don't want to kill her.  I'm just trying to scare her.  Well she swings the stick at me, towards the closet, and I'm jabbing back at her with this shotgun.

And in the midst of me jabbing back at her, I strike her a couple of times.  She fell – there's a lot of stuff in the room, a lot of – everything was all over the floor.  She fell into the dressers and stuff.

I made it back across the floor.  I struck her a couple more times with the shotgun.  I was still fighting, you know, to me I'm still fighting, we're still fighting.  And eventually –

Defense Counsel: Describe your emotions now, as this is going on?

Herron: I'm scared, I'm – at first I started off scared, then after the fighting started, got into it was – you know, *then it went from there to it was like I just seen red after that*.  It just – it just went on, it was just fighting, it just went from one thing to another.

Q: What do you mean by seeing red?

A: I got agitated, you know, prior I guess, by her still breaking in and

this confrontation that went on, it just, you know, *when the fight started, I guess all that had built up from me – from me trying to suppress this situation.   So I got kind of heated in the midst of the fight.*

Q: And you're seeing red?

A: I'm –

Q: Use words to describe – what words?

A: *Furious.   Furious, tired, lost like I don't know what to do.*   Just hurt like – it's kind of, it's – it's a hard feeling, you know, you don't know what to do, but I tried, you know, I tried.

* * *

Q: When she's coming at you with you with a stick, what are your feelings?   What are your impressions?

A: I'm about to get hit.   I'm scared; I'm about to get hit.

Q: And what type of injuries are you imagining?

A: Head trauma.   Body trauma.   Lacerations to the head, to the face.   Things of that nature.   *Things I've had before in the past.*

The State: Objection.

The Court: Sustained.

Defense Counsel: Did you fear that she would do those things to you?

Herron: I was scared that she was going to do those things to me.

Q: She has a stick in her hand, then what happens?

A: Well after a few minutes in the fight she goes down and I'm trying

to get the stick out of her hand; I don't want her to have the stick. She's down, but I don't want her to have the stick. *I'm still mad.*

So I take my right hand and I grab her by the neck, and I'm trying to pull the stick out of her hand, I'm trying to get the stick. It's like she didn't want to let it go, and I'm trying – like squeezing, and pulling, trying to get the stick out of her hand.

*So after I get the stick, I'm still enraged, I'm still mad, and I struck her a couple of more times with the stick.* * * *

(Emphasis added.)

{¶ 32} Upon review, we conclude that although the trial court erred when it precluded Herron from testifying and introducing into evidence specific instances of Newton's past violent conduct toward him, such error was harmless in light of the fact that Herron was allowed to testify that Newton had attacked him several times in the past, requiring him to go the hospital to be treated. Herron also testified that on the night of August 4, 2017, he was scared that Newton was going to injure him with the stick she was allegedly carrying. We note here that no stick matching the description provided by Herron was ever discovered by the police. Specifically, the record establishes that, although Herron was precluded from testifying to specific instances, he was still allowed to testify at length regarding his state of mind on the night of the incident as it related to Newton's past violent conduct and how he allegedly acted in self-defense. Additionally, based upon the horrific nature and extent of the injuries suffered by Newton and the fact that Herron suffered *no* injuries, his testimony that he was acting in self-defense when he killed Newton was severely undermined. *See Salyers,* 2d Dist. Montgomery No. 20695,

2005-Ohio-2772, at ¶ 32.

**{¶ 33}** Herron's first assignment of error is overruled.

**{¶ 34}** Herron's second assignment of error is as follows:

THE JURY'S VERDICTS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND THE EVIDENCE AGAINST APPELLANT WAS LEGALLY INSUFFICIENT TO SUSTAIN APPELLANT'S CONVICTIONS.

**{¶ 35}** In his second assignment, Herron argues that his convictions for murder and felonious assault were against the manifest weight of the evidence. Herron also contends that his conviction for tampering with evidence as it related to the DVR equipment was not supported by sufficient evidence and was against the manifest weight of the evidence.

**{¶ 36}** "In reviewing a claim of insufficient evidence, '[t]he relevant inquiry is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " (Citations omitted). *State v. Crowley*, 2d Dist. Clark No. 2007 CA 99, 2008-Ohio-4636, ¶ 12.

**{¶ 37}** "A challenge to the sufficiency of the evidence differs from a challenge to the manifest weight of the evidence." *State v. McKnight*, 107 Ohio St.3d 101, 2005-Ohio-6046, 837 N.E.2d 315, ¶ 69. "A claim that a jury verdict is against the manifest weight of the evidence involves a different test. 'The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and

created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' " (Citations omitted.) *Id.* at ¶ 71.

{¶ 38} The credibility of the witnesses and the weight to be given to their testimony are matters for the trier of fact to resolve. *State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967). "Because the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness." *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997).

{¶ 39} This court will not substitute its judgment for that of the trier of fact on the issue of witness credibility unless it is patently apparent that the trier of fact lost its way in arriving at its verdict. *State v. Bradley*, 2d Dist. Champaign No. 97-CA-03, 1997 WL 691510 (Oct. 24, 1997).

### Felonious Assault & Murder

{¶ 40} Herron contends that the evidence established that he was acting in self-defense when he attacked Newton, and his convictions for felonious assault and murder were, therefore, against the manifest weight of the evidence.

{¶ 41} As previously stated, " '[s]elf-defense is an affirmative defense, which means that the burden of going forward is on the defendant who must prove each element

by a preponderance of the evidence.' " *State v. Oates*, 2013-Ohio-2609, 993 N.E.2d 846, ¶ 10 (3d Dist.), quoting *State v. Kimmell*, 3d Dist. Wyandot No. 16-10-06, 2011-Ohio-660, ¶ 19. (Other citations omitted.) "Affirmative defenses such as self-defense ' "do not seek to negate any elements of the offense which the State is required to prove" but rather they "admit[ ] the facts claimed by the prosecution and then rel[y] on independent facts or circumstances which the defendant claims exempt him from liability." ' " *Id.* at ¶ 10, quoting *State v. Smith*, 3d Dist. Logan No. 8-12-05, 2013-Ohio-746, ¶ 32, quoting *State v. Martin*, 21 Ohio St.3d 91, 94, 488 N.E.2d 166 (1986).

**{¶ 42}** To establish self-defense, a defendant must introduce evidence showing that: (1) he was not at fault in creating the violent situation; (2) he had a bona fide belief that he was in imminent danger of bodily harm; and (3) he did not violate any duty to retreat or avoid the danger. *State v. Thomas*, 77 Ohio St.3d 323, 326, 673 N.E.2d 1339 (1997), citing *State v. Williford*, 49 Ohio St.3d 247, 249, 551 N.E.2d 1279 (1990). To support a claim for self-defense, a defendant must demonstrate that he acted out of fear or he felt that his life was threatened. *State v. Conley*, 2015-Ohio-2553, 43 N.E.3d 775, ¶ 59 (2d Dist.), citing *State v. Crawford*, 2d Dist. Montgomery No. 22314, 2008-Ohio-4008, ¶ 26.

**{¶ 43}** After a careful consideration of the record in its entirety, we find that the trier of fact reasonably could have concluded that Herron exceeded the scope of any self-defense privilege he may have had in this matter. The sole evidence supporting Herron's self-defense theory was his own testimony that he was scared that Newton was going to attack him with a stick that she was allegedly carrying as she approached him in his residence. Herron also testified that Newton was agitated and had been drinking

alcohol. Therefore, Herron argues that the evidence established that he acted in self-defense when he subdued Newton.

{¶ 44} As trier of fact, the jury was free to believe or disbelieve all or any of the testimony presented on these issues. Significantly, Herron did not dispute that Newton died or that he was involved in her death. In fact, Herron testified that he "jabbed" Newton several times with a shotgun, struck her several times ostensibly with the shotgun and/or his hands, and then strangled her after she fell down in order to get the stick out of her hands, which was never recovered from the crime scene. Upon finally subduing Newton, Herron testified that he went into his bedroom and fell asleep on his bed. Despite Newton's extensive injuries, including 30 to 40 contusions all over her body, five broken ribs, a broken arm, a broken leg, and deep lacerations to the back of her head and leg, Herron did not call 911. In fact, Herron did not call 911 until the next morning after he gave Richardson the shotgun and DVR equipment. Finally, Dr. Allen testified that Newton's cause of death was a combination of blunt force trauma and strangulation.

{¶ 45} Under the totality of the circumstances presented herein, we are unable to conclude that the jury lost its way in rejecting Herron's claim that he had a bona fide belief that he was in imminent danger of death or great bodily harm at the time he beat and strangled Newton, thereby causing her death. While Herron may have testified that he was initially "scared" of being struck by Newton with the stick, by his own admission at trial, he was "seeing red" and "furious" as he continued to beat and strangle Newton, spreading her blood all over the bedroom, bathroom, and hallway in his residence. Furthermore, it was significant that, for all the extensive injuries suffered by the four foot nine inches tall Newton, Herron was found to have suffered not a single injury during the

incident.

{¶ 46} Therefore, having reviewed the record, we find no merit to Herron's manifest-weight challenge. It is well-settled that evaluating witness credibility is primarily for the trier of fact. *State v. Benton*, 2d Dist. Miami No. 2010-CA-27, 2012-Ohio-4080, ¶ 7. Here the jury quite reasonably credited the extensive testimony provided by the State's witnesses, applied said evidence and all reasonable inferences to the elements of the offense, and thereafter found Herron guilty. Whether Herron acted in self-defense when he beat and strangled Newton was a question of fact for the jury to decide. Having reviewed the entire record, we conclude that there was sufficient evidence to support Herron's convictions for felonious assault and murder, and we cannot find that the evidence weighed heavily against these convictions, or that a manifest miscarriage of justice occurred.

## Tampering with Evidence (DVR Equipment)

{¶ 47} Next, Herron argues that the State failed to adduce sufficient evidence to support his conviction for tampering with evidence as it pertained to the DVR equipment he gave to Richardson before the police arrived at his house on the morning after Newton was beaten and strangled to death. Specifically, Herron contends that the evidence did not establish that he acted with a purpose to impair the availability of the evidence for an investigation when he removed the DVR equipment from his residence.

{¶ 48} R.C. 2921.12(A)(1) provides, in pertinent part, that "[n]o person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall * * * [a]lter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or

investigation."

**{¶ 49}** As previously stated, Richardson testified that he drove over to Herron's residence on the morning of August 5, 2017, for assistance in repairing his lawnmower. Richardson testified that, upon arriving at Herron's residence, he observed that the front door was standing open. When Richardson approached the residence, Herron came outside and told Richardson to enter the house. Once the men were inside the house, Herron gestured toward Newton's body and stated to Richardson, "she died on me." Richardson testified that he initially thought that Herron and Newton were playing a joke on him, and he tried to leave the residence. Herron, however, blocked the door and handed Richardson the shotgun, which had been wrapped in a sheet. Herron told Richardson that he was not supposed to have the shotgun. Richardson went outside and placed the shotgun in the bed of truck and returned to the residence.

**{¶ 50}** Richardson testified that he reentered the residence and told Herron to give him a video camera in order to prevent Herron from posting anything on social media, as Richardson still believed the whole situation to be a bad prank. Herron then handed Richardson a DVR recording box and a disc containing surveillance video from cameras installed on and around Herron's residence. Richardson went back outside, placed the DVR equipment in the bed of his truck, and drove home. Richardson testified that once he reached his residence, he removed Herron's shotgun and DVR equipment from his truck and put the items in his garage. Richardson testified that he believed that Herron would call when and if he needed the items.

**{¶ 51}** On appeal, Herron argues that, because Richardson requested the DVR equipment, the evidence did not establish that Herron removed the DVR equipment for

any reason involving the potential investigation. However, the record establishes that Herron voluntarily gave Richardson the DVR equipment despite Richardson only asking for a "video camera." Furthermore, Herron failed to retrieve or even mention the DVR equipment to anyone involved in the investigation until approximately nine months after the incident and his original indictment.

**{¶ 52}** Herron testified that, when Richardson first arrived and observed Newton's dead body, he asked Herron if there was anything in the house that Herron should not have. Herron responded by giving Richardson the shotgun and DVR equipment. Herron testified that the reason he did not inform the police of the existence of the shotgun and DVR equipment was because he thought he would get in trouble for possessing the firearm. Although he failed to provide any explanation for hiding the DVR equipment, it was reasonable to infer that Herron knew the equipment contained evidence contradicting the version of events he provided to the police regarding the night in question. Herron also testified during cross-examination that he was aware of the existence of the DVR the entire time, but did not mention it to anyone until just prior to trial.

**{¶ 53}** Thus, we conclude that there was evidence sufficient to find Herron guilty of tampering with evidence as the charges related to the DVR equipment as well as the shotgun, and we cannot conclude that the jury's verdict was against the manifest weight of the evidence.

**{¶ 54}** Herron's second assignment of error is overruled.

**{¶ 55}** Herron's third and final assignment of error is as follows:

APPELLANT'S TRIAL COUNSEL WAS INEFFECTIVE AND APPELLANT WAS PREJUDICED BY SAME.

**{¶ 56}** In his final assignment, Herron argues that he received ineffective assistance when his trial counsel failed to obtain additional expert testimony in order to refute the testimony of the State's forensic expert, Dr. Allen, with respect to Newton's cause of death and any role her blood alcohol level (BAC) might have played in her death. We note that a toxicology report established that Newton's BAC at the time of her death was calculated to be .164.

> We review the alleged instances of ineffective assistance of trial counsel under the two prong analysis set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and adopted by the Supreme Court of Ohio in *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373. Pursuant to those cases, trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. *Strickland*, 466 U.S. at 688. To reverse a conviction based on ineffective assistance of counsel, it must be demonstrated that trial counsel's conduct fell below an objective standard of reasonableness and that his errors were serious enough to create a reasonable probability that, but for the errors, the result of the trial would have been different. *Id*. Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel.

*State v. Mitchell*, 2d Dist. Montgomery No. 21957, 2008-Ohio-493, ¶ 31.

**{¶ 57}** A defendant is not deprived of effective assistance of counsel when counsel

chooses, for strategic reasons, not to pursue every possible trial tactic. *State v. Brown*, 38 Ohio St.3d 305, 319, 528 N.E.2d 523 (1988). The test for a claim of ineffective assistance of counsel is not whether counsel pursued every possible defense; the test is whether the defense chosen was objectively reasonable. *Strickland.* A reviewing court may not second-guess decisions of counsel which can be considered matters of trial strategy. *State v. Smith*, 17 Ohio St.3d 98, 477 N.E.2d 1128 (1985). Debatable strategic and tactical decisions may not form the basis of a claim for ineffective assistance of counsel, even if, in hindsight, it looks as if a better strategy had been available. *State v. Cook*, 65 Ohio St.3d 516, 524, 605 N.E.2d 70 (1992).

**{¶ 58}** "The failure to call an available witness whose testimony could acquit the defendant can constitute ineffective assistance of counsel. Nevertheless, there is a presumption that any challenged action on the part of defense counsel 'might be considered sound trial strategy.' Decisions regarding the calling of witnesses will often fall within the range of acceptably sound trial strategy." (Citations omitted.) *State v. Johnson*, 2d Dist. Montgomery No. 16803, 1998 WL 453768 (Aug. 7, 1998).

**{¶ 59}** The Ohio Supreme Court has recognized that whether to call an expert is a matter of trial strategy, and "the failure to call an expert and instead rely on cross-examination does not constitute ineffective assistance of counsel." *State v. Nicholas*, 66 Ohio St.3d 431, 436, 613 N.E.2d 225 (1993); *see also State v. Thompson*, 33 Ohio St.3d 1, 10-11, 514 N.E.2d 407 (1987).

**{¶ 60}** After a thorough review of the record, we conclude that Herron has failed to establish that he was prejudiced by his counsel's failure to call any expert witnesses in order to challenge Dr. Allen's testimony regarding the cause of Newton's death. As

previously stated, Dr. Allen testified that Newton died as a result of a combination of blunt force trauma and strangulation. During cross-examination, defense counsel questioned Dr. Allen about causes of petechiae other than strangulation, Dr. Allen's inability to state Newton's time of death, and if there was one specific cause of death. Dr. Allen admitted that she was not a toxicologist and therefore could not testify regarding what role Newton's BAC of .164 may have played in her death. The jury was able to hear Dr. Allen's testimony regarding any ambiguities involving Newton's cause of death or the exact time she died. Other than stating that additional expert testimony would have made "a huge difference" in his case, Herron fails to establish how his own expert would have changed the outcome of the trial.

{¶ 61} Herron's assertion that a defense expert may have impeached the expert testimony of Dr. Allen is merely speculative. Herron does not identify the expert that defense counsel allegedly should have called or what the witness would have said. *See State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 66. As in *Hunter*, we conclude that "trial counsel's decision to rely on cross-examination appears to have been a legitimate 'tactical decision.' " *Id.*, citing *State v. Foust*, 105 Ohio St.3d 137, 2004-Ohio-7006, 823 N.E.2d 836, ¶ 97. We accordingly cannot conclude that, had defense counsel called an expert on Herron's behalf, the outcome of the trial would likely have been different.

{¶ 62} Herron's third and final assignment of error is overruled.

{¶ 63} All of Herron's assignments of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

HALL, J. and TUCKER, J., concur.


Copies sent to:

Mathias H. Heck, Jr.
Michael P. Allen
Thomas J. Manning
Hon. Barbara P. Gorman